Good morning, Your Honors. May it please the Court, my name is Arman Sukhasyan, certified law student on behalf of Petitioner Kingsley Otuya, as part of Loyola Law School's Ninth Circuit Appellate Clinic. I am joined today by my co-counsel, Alejka Louise Valera, and our supervisors, Mary-Christine Sangheila and Jeffrey Kelman. My co-counsel and I will be splitting our time today. I will be speaking for eight minutes on the likelihood of future torture and my co-counsel will be covering the acquiescence standard and relocation. I would like to reserve two minutes for rebuttal. Otuya petitions this Court to review the agency's denial of his deferral removal under CAT. If returned to Nigeria, Otuya faces a risk of torture at the hands of his former criminal boss, Mr. E, and his criminal network. During his incarceration, Otuya provided critical information that led to Mr. E's arrest and conviction in the United States. And because of this, Otuya is now part of a personal vendetta by Mr. E and his criminal network. We know that men arrived at Otuya's mother's home in the middle of the night and asked for Otuya by name, proceeded to enter, and broke her femur during this incident. They told her that Otuya cannot hide forever and that they are fully waiting for him. The agencies below ignored key pieces of evidence regarding Mr. E and his criminal network's vendetta against Otuya and this Court has consistently held that where there's any indication that evidence was ignored by the agencies below, the only recourse is to remand this case so that the agencies can conduct a full assessment of all the evidence. Here, if I can stop you there, I mean, that is, that is a correct statement of the law. But we have also said that we do not lightly infer that the agency has ignored evidence just because, you know, they don't have an obligation to like write an opinion that ticks off every single piece of evidence that they considered. So, you know, what would you point us to to show that they ignored evidence as opposed to simply not finding it very persuasive? I guess you're correct. There is a presumption of regularity for the agency's opinion and in this case, there is a long detailed opinion. However, that rule of law comes from Cruz v. Bondi and in that case, what can show that there is an ignored evidence is that the petitioner cites specific evidence in the record and explains why it's ignored. In this case, Otuya is citing a specific police report in the record that was not assessed almost at all by the agencies below. And because of that, the presumption of regularity has been overcome because that police report is so vital to Otuya's case. I mean, the agencies below gave almost no assessment to the police report that was filed shortly after the attack on Otuya's mother. The police report explicitly states that the men who attacked his mother were there to threaten Otuya. It further states that they were there because of the names that he provided during his incarceration and that they are fully waiting for him and that he can't hide from them. The men directed their aggression towards Otuya's mother instead of Otuya because he was not there. The agencies below ask if we agree with you that there was an error in whether the agency should have realized that these people were looking for Otuya. You still need to find all the steps in the chain are like more likely than not to occur and one of the steps is that if Otuya returns, Mr. E will realize he had returned and find him. And it seems like the BIA said it's too speculative that Mr. E would know that the respondent had returned to Nigeria. How do you show that that was erroneous? Well, Your Honor, in that case, the fact that Mr. E could or could not find Otuya, Mr. E has a large network. We know that because he has luncheons with the police chief in Nigeria based on Otuya's credible testimony. His influence is vast and he essentially is the head of a large criminal enterprise. In this case, he already knows where his family lives. He knows where to find them. In this case, the family's moved though, right? Yes, Your Honor. So in theory, he doesn't know where they are now. Well, we don't know. We don't know if he knows or not. But there's no evidence that he knows where they are now. Currently, no. And the police report, I mean, you talked about it being ignored, but it kind of cuts against the argument that the police are kind of in Mr. E's pocket, right? Because they wouldn't have issued the report if they were if they were trying to protect Mr. E and go and not protect Mr. Otuya. Your Honor, the acquiescence standard in this case, while these police clearly wrote the report again about the attacks that happened at Otuya's mother's home, the acquiescence standard does not require that every police officer in Nigeria is acquiescing to any kind of torture that Otuya will face. So while these policemen might have been doing their jobs, we don't know exactly what their motivations were. We can't speculate towards that. But just because one police officer took this report does not necessarily mean that no rogue official anywhere will acquiesce to Otuya's torture. And I'm sorry to interrupt you, but can you take us through again, what's the sequence of facts that shows it's more likely than not that Mr. E is going to find out that Mr. Otuya is back? So the sequence in this case would be that if Otuya's returned to Nigeria, Mr. E's network knows where, you know, knows how to find him and would know where his whereabouts are. And because of his cooperation with the United States government, I mean, he basically let, he basically caused the arrest and conviction of the head of a large criminal enterprise, which means that every single person in that enterprise is now without leadership, without some kind of payroll, essentially. So all those people would be looking for Otuya in a way because of his cooperation with the United States government. So I thought that the IJ held, though, that Mr. E's businesses and connections were really in Lagos and that there were lots of other states in Nigeria. So didn't the IJ think that this network was not going to find your client if he returned to a different state? Well, Your Honor, the IJ based that, based, her basis for that was that Otuya stated in her, in his testimony that he doesn't know where else Mr. E has businesses. But that does not mean that, you know, especially where in a state where the police are federally run, if Otuya, if Mr. E has connections with the police chief and has connections that are amounts of bribery, you know, it basically means that Mr. E would be able to seek him out in that case, no matter what state he enters. You need to show that the record compels the conclusion that he would be found, right, to show that the agency erred for us to be able to grant. So what would you point to in the record to support the idea that the network of police that he's connected to is everywhere? Your Honor, I know it's almost out of time. May I answer your question? Go ahead. Yeah. So, Your Honor, we are not necessarily asking for a ruling here that shows that evidence compels this conclusion. We're only asking to remand this case so that the evidence, such as the police report that basically was given short shrift at the agency level, could be fully considered, not just the fact that it was made. But if that police report is going to get you past the idea that it was Mr. E and his people looking for Otuya, but that's only one thing. You still need to get to, yes, they're looking for him or they were looking for him then, but they would also look for him over in that state. It's that piece that I am not sure what your evidence is. Yes, Your Honor. In that case, we don't have definitive evidence that Mr. E has, like, you know, depots in different states in Nigeria. However, for the CAAT standard, it is only a chance or 50 percent that there's a likelihood of future torture. And this kind of evidence might be past what CAAT requires, especially because of the obligation that CAAT requires for a full assessment of all evidence for likelihood of future torture for every applicant. Let's let your colleague have her time. Thank you.  Good morning, Your Honors. My name is Alika Louise Valera, certified law student from Loyola Law School, supervised by Mary Christine Singela and Jeffrey Kelman on behalf of Petitioner Kingsley Otuya. Upon his return to Nigeria, Otuya faces imminent death and torture at the hands of Mr. E and his criminal network, the same criminal network that ransacked his family's home and broke his mother's leg to relay a message of revenge for Otuya's cooperation with the U.S. government that led to Mr. E's incarceration. That is why this court should ensure that the analysis of Otuya's CAAT claim was done according to the regulations in case law. In addition to ignoring evidence in the record, the agency also erred in the analysis of Otuya's relocation as a part of the likelihood of torture by focusing on his family's relocation within Lagos as a positive of his own relocation once he returns to Nigeria. And they also erred in misconstruing the acquiescent standard under CAAT. Because relocation stems from the likelihood of torture analysis, I will begin with that. The CAAT regulations state that the agency must consider all evidence pertaining to an applicant's likelihood of future torture, including his to relocate. The agency prematurely ended this relocation analysis by relying on the fact that Otuya's family had not been attacked after they relocated to another neighborhood. A family's relocation can be dispositive of an applicant's possibility of relocation only when that family faces the same harm as the applicant and is thus similarly situated. That is not the case here. You said that the family's relocation and the sort of the successful ability of the family to relocate to a different neighborhood within Lagos was dispositive of the issue of Otuya's relocation. Is that what the IJ found or was it persuasive? In other words, was the idea that the family was able to move to a different neighborhood within Lagos where Mr. E is operating within Lagos, combined with the fact that there's no evidence that Mr. E is operating outside of Lagos and there's plenty of other states within the country that Mr. Otuya could move to, wasn't that the sum total of the evidence? Well, the IJ relied on that fact that the family was able to move and they had not yet been attacked, but that in itself led the IJ to ignore evidence in the records such as Mr. E's criminal networks clout and the fact that the Nigerian government and police force is centralized all throughout Nigeria. So there really isn't, an inference that can be made that if moving or moving to a different neighborhood would essentially spare Otuya. What is your best evidence you can point to in the record that Mr. E's network is in all of the states of Nigeria? Well, it's Otuya's testimony that one, the police force is centralized in Nigeria, as well as he has that clout all throughout Nigeria. While we don't have specific evidence in the record of Otuya's testimony or record evidence that states that there is that connection, there also isn't record evidence that states the contrary. So insofar as you're relying on his testimony, the IJ did not enter an adverse credibility finding. I think it's fair to say the IJ was somewhat skeptical of certain aspects of the testimony in this curious filing purportedly from the Western District of Texas. But under Ming Dai, even in the absence of an adverse credibility finding, it doesn't mean that the IJ is required to take all of the testimony as establishing all of the inferences that might conceivably be drawn from it. So how do you deal with that? In subsequent cases after Ming Dai, it's found that if there is credible record evidence that corroborates an applicant's testimony, then there really isn't a discrepancy, which is what happens here. Otuya's testimony is largely consistent with his mother's declaration, as well as the police report stating- But what about as to this point about relocation and where Mr. E's network extends? Because that's the corroboration that seems needed for this last piece in the chain, that if your client returns, that Mr. E will know that and find him. Yes, Your Honor. The fact that Mr. E has connections to the Nigerian government, to Nigerian police officials, that in consideration with country conditions evidence that shows that there is corruption in Nigeria, shows that there is this ability for Mr. E to find Otuya wherever he goes in the country. And again, there isn't evidence in the record that is contrary to that. Let's save the remainder of your time for your colleague. Thank you very much. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court, Stephanie Groff for the Attorney General. Your Honors, this Court should uphold the Convention Against Torture, Denial, and Deferral of Removal as Mr. Otuya has first failed to demonstrate that it is more likely than not that he would be tortured in Nigeria, and second, that any torture would be by or with the consent or acquiescence of a public official or other person acting in official capacity. I want to first just jump right into the claim that the agency ignored evidence as it relates to the police report. This is bellied by the record of the immigration judge's decision itself. I'd like to point this Court to AR-58, where the immigration judge, after addressing Mr. Otuya's mother's declaration and the differences between that and Otuya's own testimony, then goes into noting that Mr. Otuya's mother did submit a police report, but then noted that it is curious why the mother herself in her declaration did not note that she and therefore held that, you know, this is not exactly evidence that goes to further support what Mr. Otuya is stating, that Mr. E orchestrated these individuals to find him. So, at baseline... Why does that make sense, though? Why would the mother need to mention that she filed the police report? Well, it makes sense, and the immigration judge viewed it as curious, especially because Mr. Otuya's mother's statement stated that individuals came to her home. In fact, she even said they didn't explain why until they stated, you know, we're looking for your son. And then the immigration judge is looking at the police report, which was inherently more detailed than what Ms. Otuya had purported herself. And the immigration judge took the police report, Ms. Otuya's testimony, and Mr. Otuya's testimony and held their various discrepancies. And yes, there's no requirement that Ms. Otuya had to mention that she filed a police report, but the judge took a reasonable inference that it was curious that she herself did not mention it in filing it. The immigration judge also noted in that same paragraph that it was not clear what the chain of custody was in this police report, how it was obtained, who got it, and again, that Ms. Otuya was not there or was not made available to testify. I'll also... Even if we put the police report issue aside, the mother's description of the event, she does say her son, and that seems to be what the IJ was worried about. But then in the second paragraph, she says that her son is Otuya. So, I really have trouble understanding where the idea came from that the son was the son-in-law. Yes, I agree, Your Honor. It is a bit confusing. The immigration judge hung her, I believe, her hat on the fact that it might have been the son-in-law or Mr. Otuya himself. But the immigration judge specifically was referencing Otuya's testimony himself. It wasn't until cross-examination where Otuya mentioned that, oh, actually, these individuals mentioned the son-in-law, but it was the ruse to get inside the house. Ultimately, the immigration judge didn't make a finding that it was... The immigration judge noted that it wasn't exactly clear, but taking at face what it means, it does not show, more likely than not, that Mr. E was the one that orchestrated that attack. So, let's assume we disagree with you about that. Let's say that it's clear that it was Mr. E orchestrating an attack that was threatening Otuya. Can you still win or do you lose at that point? We can still win. And Your Honor mentioned the hypothetical chain of events, and so that's where we would win. So, here we have a variety of hypothetical chains of events. I'd like to say whether Mr. E orchestrated that attack. Let's say that's the third. But in order to say that Mr. E orchestrated, the alien here has to prove that Mr. E would learn that Otuya has been removed to Nigeria. So, that's the step before. And in order to show that, they need to show that it's more likely than not that they'll have that knowledge. And the immigration judge here found that based on Mr. Otuya's testimony, oh, they'll know when I come back because the Nigerian government will arrest me immediately, and therefore Mr. E is going to know, and that way he'll find out I'm in Nigeria. The immigration judge did not find that persuasive. And so, that second step of the that he cooperated with law enforcement, that has not been proven more likely than not. Then, even if we assume that we lose on that aspect, that Mr. E has the means and abilities to target him, there's still the fourth or however many chains aspect that the government in Nigeria will consent or acquiesce to the harm. My friends on the other side were discussing the lack of record evidence to support their claim or to the contrary. But the standard here is whether record compels a contrary conclusion. The immigration judge here, as you noted, Judge Scarcy, didn't just look to evidence that family safe and other stuff. The immigration judge was considering as a whole whether the government itself would consent or acquiesce. And the concept that because Mr. Otuya saw Mr. E work with police and fraternize with them and obtain private security, the judge found that that is not enough to show that they would consent or acquiesce to torture. And in fact, the record evidence, the country condition, it was an article that talked about police security never mentioned anything that the police were, yes, they're providing security, but then contributing to illegal activity. Mr. Otuya himself never testified that he observed Mr. E doing illegal activity in Nigeria and that the police who were his security were consenting or even participating in it. So this is very hypothetical. It is speculative. There is evidence, I think, though, that the police in Nigeria are corrupt. So what do you understand that corruption to involve? Well, the evidence discusses corruption, and there was a former police unit that was very problematic that has been disbanded. There is evidence that the police do take bribes, that they stop people in the streets and seek to obtain money from them. But Mr. Otuya here has not shown, again, it's a hypothetical that they would consent or acquiesce to someone seeking them out for torture that has been orchestrated by Mr. E. And Ms. Otuya and my friends on the other side are really only pointing to the fact that Otuya observed Mr. E having private security and fraternizing with Nigerian officials. The immigration judge and the board that upheld it found that this does not show that it is more likely than not. That is a high standard here for cap protection, more than 50%. And the standard, as your honors mentioned, is that the record compels a contrary conclusion. I'll point to the Supreme Court's recent decision in Uriah, sorry, I'm misstating it, which was recently published. It was about past persecution, but the language in that talks specifically about whether substantial evidence supports agencies, fact findings, and whether that a non-citizen has to show that it compels a contrary conclusion. And that applies directly here. And this court has various case law about that. Are you by any chance familiar with our decision from last month in Navarrete against Pondy? I believe I read it. Could I have a little refresher? It's about jurisdiction over a cat only. Oh, yes. I'm very familiar. If the government has any thoughts on whether that's relevant here or not. Yeah. So I believe that refers to the Riley aspect, which is Supreme Court's decision in handling cat only claims. We're not making any argument here that this court can't make a decision in this case. While Otuya was only eligible for cat deferral removal, we would point this court to Nasrallah, which states that this court can review those findings. A denial of convention against torture. This wasn't a reinstatement case. This wasn't a administrative removal because he does have an aggravated felony, but he was placed in proceedings. He applied for asylum, withholding removal and cat. And while the immigration judge found that he was ineligible for the first two based on the aggravated felony, they denied cat. And so we believe that this court can review the decision, but only whether the record compels a contrary conclusion. Unless you want to engage with the fact that the agency ignored evidence, but we argue that that's unsubstantiated. And the record here shows that the agency considered it all, but held that it was not persuasive. And as you mentioned, Judge Miller, Ming Dai is really the informative case here. Someone can be credible, but it doesn't mean that the immigration judge has to rule in their favor. I like to bring up the point in Ming Dai about the traffic light just because someone believes that they didn't run through the red light. If there's evidence later that comes about that they did, it doesn't mean that they were lying. It just means that there's other persuasive evidence here. And here, that's what we have. While Mr. Atuya believes that it was Mr. E that orchestrated the attack, that he believes that Mr. E will know that he will find him if he's removed, that he will be tortured, that the government would acquiesce. These are hypothetical chains and the immigration judge didn't have to refer and hold that these speculative fears would more likely than not show that he would experience torture. On the relocation point, whether Mr. Atuya could relocate to a different part of Nigeria, is there any evidence in the record either way on that, that it would be safe for him to do so? So I would point to the evidence that you mentioned, Your Honor. The fact that the immigration judge noted that there are 31 states in Nigeria and Mr. Atuya only testified that Mr. E has businesses and ties in Lagos itself. The immigration judge took that and stated there's nothing else in the record that mentions Mr. E. I mean, this is distinguishable from cases that this court had been addressing cartels or gang violence. Mr. E is one individual who was a part of a money laundering scheme that defrauded millions of dollars in the United States. And there's nothing in the evidence to show that he has these ties. So the judge looked not only to being able to safely relocate within Lagos, but the kind of absence of evidence that he would be unsafe anywhere else. And Mr. Atuya claimed that he wouldn't be. But again, that's his own testimony that the immigration judge did not need to find persuasive. Do you agree there's no evidence one way or the other? Well, we would argue that as my friends on the other side mentioned, the family's ability to relocate is enough to show that there's evidence that he would be able to relocate. But beyond that, it's more of the absence of evidence. That doesn't make a lot of sense to me, though, because why would Mr. E go after the family? Well, Your Honor, Mr. E has already gone after the family. I mean, he went to... But looking for Atuya, supposedly. So if he knows Atuya's gone, which I guess is part of the idea here now, because he wasn't in the house, then the family itself moving doesn't seem that relevant. I respectfully disagree. I believe if we take to heart that Mr. E orchestrated this attack, there's no indication that he wouldn't do it again to find out if Atuya is back. The fact that he orchestrated these people for assuming that back in 2023 show that the hypothetical chain that he would not be able to know that Atuya has been removed. But the family safety, I mean, in this court, relocation is interesting, though, with cat protection, because it is different than a lot of the cases that we have with asylum withholding of removal, which is a different burden shifting scheme. But this court has held that looking to whether a family can relocate, yes, it might not be exactly situated as Atuya, they're seeking out him. But the fact that his mother was already harmed, the judge found that this is evidence that they could be safe. I'll also note that Ms. Atuya lived with her daughter and brother-in-law, and there's no evidence in the record, and the judge noted this, that they've been sought out for harm, and they also did not provide any declarations to kind of corroborate or explain what exactly happened. And with that, if no further questions, we'd ask that this court deny the petition for review. Thank you. Thank you. Let's put two minutes on the clock for rebuttal. Your Honor, there's four points here. First, for the police report, it is true that I.J. did quote one line of the report in her opinion. However, she never actually discusses the contents of this report in her opinion. We don't know if she found that persuasive. We don't know what weight she gave it. But we do know that she considered it. Well, she didn't consider it to the extent that is required under the case law, which is to give all key pieces of evidence reasoned consideration. So she did not give this piece of evidence reasoned consideration, and she merely said it was curious that the mother's declaration did not match up perfectly with this report. However, I mean, we know that the mother is the one who filed their police report three days after the incident. There is no requirement that the declaration must match exactly with the contents of the report. And with that, she ended her assessment of the report as a whole. She really used the fact of the report to say that the police would not acquiesce, which we know is not enough under the acquisition standard. Second, this chain of suppositions that IJ has laid forth for OTO's claim, we know that when there is a substantiated evidence in this case, giving, recasting this substantiated evidence as a chain of suppositions, an agency is not free to do that under this court's case law, such as in Hale v. Holder. In this case, OTO is also found credible, and his credible testimony was not rebutted by the mountains of competing evidence that existed in Garland v. Ming Dai. This court has further held after Ming Dai, such as in Blancarte v. Saucera and in De Leon v. Garland, that where there is evidence that is neither, that is not rebutted as a whole or contradicted, that credible testimony must be accepted as true, and all the reasonable inferences from that testimony should also be considered as true. So, in this case, there is no competing evidence for OTO's CAD claim. We don't have a large amount of evidence that says that he will, there's no way Mr. Lee will know where he is and torture him. And further, final point is that we're not asking this court to determine whether this evidence compels a certain conclusion. We're only asking this court to remand this case back to the IJ, remand this case to the BIA, then to the IJ, with instructions to the IJ, so that the IJ can consider the police report and also the mention of bribery in her opinion. She labels this as providing transportation assistance or paying the police to provide escorts, but we know that this is a bribery, that Mr. Lee's committing bribery to have the police do his bidding, which is what OTO states in his credible testimony. So, we ask this court to remand to the BIA with instructions to the IJ to consider the entire record. Thank you. Thank you both sides for the helpful arguments and thank you to the law school and the students for this very helpful representation. It's really a great assistance to our court when people take on cases pro bono and we really appreciate all the work you've done and excellent job. So, thank you everyone. We are adjourned for the day.
judges: FRIEDLAND, MILLER, Scarsi